A. A. McKETHAN, Jr., et als., v. THE BOARD OF COMMISSIONERS OF CUMBERLAND COUNTY.

*Counties and County Commissioners—Taxation.*

Under an act of the General Assembly to enable the people of Cumberland county to establish a free bridge over the Cape Fear river, the county authorities are authorized to issue bonds and levy a tax to meet the expenses of the same.

(*Evans* v. *Commissioners*, 89 N. C., 154, cited and approved).

Motion for an injunction, heard at Chambers in Cumberland Superior Court, before *Avery, Judge.*

The General Assembly passed an Act, ratified and taking effect on March 8, 1883, entitled, "An act to enable the people of Cumberland county to establish a free bridge over the Cape Fear river at or near the town of Fayetteville, North Carolina," (Laws of 1883, ch. 260). This Act directs the county commissioners, on petition from not less than five hundred voters, presented on or before the first Monday in April, to submit the question of a free bridge to the qualified voters of the county at an election to be held on the first Thursday in May, and prescribes the manner in which it shall be conducted and the popular will ascertained.

Section five, so far as its provisions relate to the present inquiry, is in these words:

"If it shall appear that a majority of the votes cast at such election were for 'free bridge,' then the said board of county commissioners shall certify the same to the chairman of the board of justices of said county within five days of said meeting, and the chairman of said board of justices shall call a joint meeting of the justices and commissioners of said county, to be held on the first Monday in June next following, which meeting shall make or cause to be made such contract or contracts as may be necessary for the speedy establishment of a free bridge across the Cape Fear river at Fayetteville, North Carolina; *Provided*, that

if the owners of the Clarendon bridge, now across said river, will agree to sell their said bridge and franchises, together with the right of way to and from said bridge, over and across any land they may own contiguous thereto, for a sum not to exceed thirty-five thousand dollars, then a purchase of the same shall be made by said board of justices and county commissioners; but if no agreement can be made, they are hereby authorized to make any contract necessary for the erection of a new bridge across such river at or near the town of Fayetteville."

The contract being entered into, the commissioners, if in their opinion deemed best, are empowered to issue coupon county bonds, bearing date January 1, 1884, in sums not less than twenty-five nor more than five hundred dollars, at a rate of interest not exceeding seven per cent., and to mature at a period not beyond thirty years. The bonds are required not to be sold under par, and the coupons, as they become due, are receivable "in payment of taxes and other claims due the county of Cumberland." Sec. 6.

The next section authorizes and directs the annual levy of special taxes, as long as may be requisite, "sufficient to pay the coupons as they become due," and to provide a "sinking fund" to pay the principal as the bonds mature, not in any one year to exceed the sum of two thousand dollars.

If the commissioners decline to issue bonds, annual special taxes are to be levied and collected, as long as necessary, which shall not in any one year be above "ten cents on the hundred dollars' valuation of property and thirty cents on each taxable poll." Section 8.

It appears from the record, that an election was held on the day designated in the statute, wherein were cast 1,696 votes for "free bridge," and 1,142 votes for "no free bridge," but the former, who favor the proposition, are conceded not to be a majority of the number of voters in the county.

At a joint meeting of the justices and commissioners, held in pursuance of the terms of the act, they decided to purchase the

Clarendon bridge, at the price of $35,000, and the commissioners decided to issue bonds, and proceeded to levy a tax of five cents on each hundred dollars worth of taxable property and fifteen cents on the poll.

This action was instituted by the plaintiff in behalf of himself and the other tax-payers of Cumberland county, to enjoin the commissioners from issuing the bonds and also from levying the tax.

His Honor refused to grant an injunction, and the plaintiff appealed.

*Mr. N. W. Ray*, for the plaintiff:

The plaintiff seeks relief on the ground that the issuing of the bonds would be illegal, and that the levying and collection of taxes to pay the annual interest would cause irreparable loss to himself and the other tax-payers.

The defendants claim that chapter 260 of Acts of 1883 authorizes them to proceed. As a matter of course, if the issuing of the bonds would be illegal the collection of the tax would not be permitted.

Plaintiff says:

1. Proper notice of the election was not given.

It was a special election, held at an unusual time, and the requirements of the Act ought not to be considered directory.

The law itself was not notice, because the commissioners were to decide at their April meeting whether an election was to be held. Then, was any notice necessary? *Cooley on Con. Limitations, pages* 602 *and* 603.

If any notice was necessary, must it not be such notice as the Act required? The fact that defendants tried to give notice, and that the proposition of "Free Bridge" was discussed, cannot supply the want of notice.

2. The Act was unconstitutional in so far as it provided that "*a majority of the votes cast*" should decide the question. The

proposition was within the provisions of article 7, section 7, of the Constitution, and could not prevail "unless by a vote of a majority of the qualified voters in the county." 4,400 voters: 2,201 is the required majority. *R. R. Co.* v. *Commissioners*, 72 N. C., 486.

The construction adopted in that case is supported by comparing Article 5, §4, restricting the General Assembly from increasing the public debt unless "*approved by a majority of those who shall vote thereon*," with Article 7, §7, restricting counties and towns, "*unless by a vote of the majority of the qualified voters therein.*"

The voters had a right to consider the opinion in that case as the true construction of the Constitution; and then a vote against "Free Bridge" was not necessary, because the proposition would fail unless a majority of the qualified voters favored it by voting for it.

This, together with the want of notice, may account for the fact that so few voted.

The General Assembly may authorize the commissiorers to exceed the double of the State tax. Article 5, §6; *Brodnax* v. *Groom*, 64 N. C., 244. But, if in doing so they encounter the restrictions imposed by Article 5, §1, and Article 7, §7, they must get the approval of the voters.

To allow the commissioners unrestricted power to say what expenditure would be necessary, and then to provide for it by issuing bonds or levying taxes, regardless of the limitations in Article 5, §1, and Article 7, §7, would be carrying the doctrine of *Brodnax* v. *Groom* so far as to nullify those provisions.

The Convention of 1875, which especially considered county government, was careful to preserve Article 7, §7, which had, just before that Convention, been construed in *R. R. Co.* v. *Commissioners*, 72 N. C., 486.

Then the General Assembly cannot authorize commissioners to contract debts, pledge the faith or loan the credit of the county, unless by a vote, &c.

3. But the resolution at the June meeting, 1883, declaring the establishment of a free bridge to be a necessary expense, &c., was disapproved by the commissioners—three of them voted against it and only two voted for it.

The commissioners may say what expenditure is necessary.— (*Brodnax* v. *Groom.*) It is only when they propose an expenditure exceeding $500 that it is necessary to have the concurrence of a majority of the Justices. Acts 1876-'77, chapter 141, and Code, section 707, subdivisions 10 and 11.

Can these acts be construed to mean that a majority of the justices and commissioners, sitting as one body, shall have this power? Is it not rather as two legislative bodies? The commissioners must favor the expenditure, and when it exceeds $500 the majority of the justices must concur.

4. The resolution in August, 1883, accepting the Clarendon Bridge Co.'s proposition to sell their bridge for $35,000, and authorizing the commissioners to issue bonds, &c., was not voted for by a majority of the justices, and therefore was not properly passed.

What does the law mean when it says "*with the concurrence of a majority of the justices?*" Suppose there are 59 justices in a county; 30 is a quorum. In a meeting of 30, would the approval of 16 be sufficient?

Suppose a joint meeting with five commissioners and 30 justices: Could 18 justices authorize an expenditure that was disapproved by a majority, or even all of the commissioners, into whose hands the law places county matters.

The resolution in June declaring a free bridge a necessary expense, was disapproved by the commissioners and approved by the justices; and the resolution in August agreeing to pay $35,-000 for a bridge, and authorizing the issue of bonds *to that amount*, was approved by three commissioners, and they failed to get the concurrence of a majority of the justices.

Then neither of said resolutions will sustain the proposed action of the commissioners.

5. The tax levied in 1883 to pay interest on the bonds proposed to be issued was in excess of the constitutional limitation. The complaint does not allege that the bridge tax of 1884 would be in excess, but the Court can take notice of the fact that for 1884 there was no State tax collected. We cannot know certainly how it will be in future years, but there is an allegation and almost an admission that the addition of the bridge tax will, in future years, cause the annual taxes to exceed the limitation.

6. The act required that if the vote was sufficient, the meeting in June should buy the Clarendon Bridge if it could be had at a price not exceeding $35,000. That bridge was offered at that price and they did not accept, and at the August meeting the proposition to buy and issue bonds did not have the concurrence of a majority of the justices.

7. The commissioners have no other authority to issue said bonds except as stated in the complaint, and base their whole proceeding on said chapter 260.

Then the question is,

Will the said proceedings be approved so as to authorize the commissioners to issue said amount of bonds upon a resolution approved by only two commissioners and a majority of the justices, as at the June meeting, 1883; or upon a resolution approved by three commissioners, but not concurred in by a majority of the justices, as at the August meeting, 1883; and so to pledge the faith and loan the credit of the county for that which has never been properly declared to be a necessary expense, and all without "*the vote of a majority of the qualified voters therein?*"

*Mr. Z. B. Newton,* for the defendant.

SMITH, C. J. The facts presented in the present appeal from the refusal of the judge to interpose by a restraining order, and arrest the action of the commissioners in carrying into full effect

the act of March 8, 1883, ch. 260, as well as the matter of law arising thereon, are essentially the same as those considered and disposed of in *Evans* v. *Commissioners*, 89 N. C., 154.

The cases referred to in the re-argument and the issues pressed upon our attention have not unsettled our former convictions of the correctness of the conclusions then reached.

But if any disturbing doubts had been produced upon a re-examination of the subject, they are put at rest by the curative and ratifying statute passed at the present session of the General Assembly, supplemental to and amendatory of the former enactment.

This act recites the holding of the election to ascertain the popular will, the issue of the authorized county bonds, the levy of the tax, and then proceeds to declare the bonds, when disposed of at their par value, to be binding, and to direct the collection and payment into the county treasury of the taxes levied. The remaining provisions of the act are intended to facilitate and complete the transaction in the transfer of the bridge, and the last section (6) requires the disposition of the "bridge bonds" to be effected before the 1st day of June, 1885, and unless this be done, repeals the original act and all laws made in pursuance thereof.

There is no error in the ruling and this will be certified.

No error.                                        Affirmed.